PEOPLE, PLAINTIFF AND APPELLEE, *v.* CORREA, DEFENDANT AND APPELLANT.

APPEAL from the District Court of Humacao in a Prosecution for Violation of a Municipal Ordinance.

No. 1948.—Decided February 23, 1923.

CONSTITUTIONAL LAW—MUNICIPAL ORDINANCE—DEMURRER.—A question of constitutionality may be raised by demurrer.

ID.—ID.—SALE OF MEATS—MONOPOLY.—Apart from the fact that the Municipal
    Law of 1919 did not reserve to the municipalities the power to create monop-
    olies in the sale of fresh meats, which implies a repeal of Act No. 52 of
    1917 in so far as it conferred that power, the said act is unconstitutional
    in so far as it authorizes a municipality to enact an ordinance forbidding
    the sale of fresh meats within the municipality by any person who is not
    a representative of the municipal government. Consequently a municipal
    ordinance establishing such a prohibition and monopoly is unconstitutional.
ID.—ID.—ID.—ID.—POLICE POWER.—Under a mere pretense of regulations of
    police power personal rights can not be usurped, for the right to engage
    in any of the common occupations of life is inalienable under the American
    Constitution.

The facts are stated in the opinion.

*Mr. F. Piñero* for the appellant.

*Mr. José E. Figueras, Fiscal,* for the appellee.

MR. JUSTICE WOLF delivered the opinion of the court.

Cruz Correa de Jesús was convicted of a misdemeanor by
virtue of a complaint filed against him essentially as
follows: That on January 28, 1922, at a house within the
municipal district of Caguas the said Cruz Correa slaugh-
tered and offered for sale fresh beef at a stand within said
house, selling it to the public, thus infringing the first sec-
tion of "An ordinance to regulate the killing of beeves and
the sale of fresh meat by administration in the municipality
of Caguas, Porto Rico." The ordinance was as follows:

I, Ramón Santini, Municipal Secretary of Caguas, P. R., Certify:
That the Municipal Council of Caguas at a meeting held on Oc-
tober 24, 1921, passed the following ordinance, which was pub-
lished in the newspaper *La Democracia* on October 28, 1921, and
went into effect on November 18 of the same year: An Ordinance
to Regulate the Killing of Beeves for the Sale of Fresh Meat by
Administration in the Municipality of Caguas, Porto Rico, fixing
Penalties for its Violation. Be it Ordered by the Municipal Council
of Caguas: Section 1.—It is hereby ordered that for the present
the slaughter of beeves for the sale of fresh meat in the municipality
of Caguas shall be conducted by administration; that the meat
shall be sold to the people of the municipality at cost plus ten per
cent profit and the amounts so collected shall be paid into the munic-
ipal treasury; that, moreover, no person or persons other than the

official representatives of the municipal corporation shall sell fresh · meat within the limits of the municipality of Caguas while this Ordinance is in force and effect.—Section 2.—The meat shall be sold to the consumer absolutely clean and free of extraneous matter and in the proportion of ¾ flesh to ¼ bone.—Section 3.—The prices of the meat shall be posted daily on a board in a conspicuous place. Any person or persons deviating from such prices shall be liable to the penalties imposed by section 4, as follows: Section 4.—Any person violating any of the provisions of this ordinance shall, upon conviction, be punished by the municipal, or justice of the peace, court by fine not less than $10 nor more than $50 or by imprisonment not less than five nor more than fifteen days.—Section 5.— The Commissioner of Public Service is hereby authorized to dispose of the necessary amounts from the emergency fund for the purchase of the necessary cattle and to meet other expenses essential to the execution of this ordinance; provided, that the council of administration shall prepare the necessary regulations for the execution thereof.—Section 6.—This ordinance shall begin to take effect twenty days after its publication, shall continue in force for ninety days, and may be renewed by the Municipal Assembly as many times as it may deem proper. All conflicting ordinances or parts thereof are hereby repealed. And for official purposes I issue the foregoing in Caguas, Porto Rico, this thirtieth day of January, 1922.''

In the court below, on the presentation of a complaint to the foregoing effect, the defendant filed a demurrer that the facts set forth did not constitute a public crime, because ''the acts as charged do not constitute a crime in Porto Rico, because the ordinance alleged to have been violated by the defendant was passed by virtue of Act No. 52 of December 3, 1917, entitled 'An Act authorizing municipalities to regulate the sale of fresh meats' and the said Act was repealed by the Legislative Assembly of Porto Rico in enacting in the year 1919 the Municipal Law now in force in Porto Rico, it not being included among the laws that were to continue in force in the development of the municipalities. Second, because it infringes a provision of the Constitution of the United States of America and violates a provision of the Jones Act to the effect that no law im-

paring the obligations of contracts shall be enacted. Third, because the adoption of the said ordinance was beyond the scope of the powers granted to the municipal corporation as police powers in accordance with the act by which it was created. Fourth, because the said ordinance establishes a business which constitutes an actual monopoly in open disregard of the provisions of the Sherman Act which is applicable to Porto Rico."

The appellant assigns various errors to attack the validity of this ordinance and among other assignments are several going to the constitutionality of Act No. 52 of 1917 as well as of the ordinance itself. The government asserts the validity of the act in every respect, except as to the question of constitutionality. In this regard the government says that the question of constitutionality was not duly raised, but assuming that it was duly raised, then the government agrees that the act is unconstitutional.

The government has a theory that in order to attack the constitutionality of an act there must be a special motion made in the court below raising the question. The record shows that the defendant presented a demurrer to the court raising all questions. The opinion of the court, too, shows that the defendant duly raised and presented questions of the constitutionality of Act No. 52, *supra,* and of the unconstitutionality and unreasonableness of the ordinance as being in violation of individual rights. Not only was the question raised in this form, but the court in its opinion proceeds to discuss the constitutionality of the act and to justify the act and the municipality under the theory of the police power of the State. The citations that the *fiscal* makes are simply to the effect that a constitutional question must be raised in the court below. We have always understood that a constitutional question might be raised by demurrer. It was so raised and considered by the court below and disposed of. We know of no authority that makes another form of

raising the question necessary. Furthermore, if there had been any lack of form in this regard, this lack of form was not insisted upon in the court below, and, under our general powers, we could overlook a lack of form. Act No. 52 of 1917 is as follows:

"An Act Authorizing Municipalities to Regulate the Sale of Fresh Meats.—*Be it enacted by the Legislature of Porto Rico:*

"Section 1.—That the municipalities of Porto Rico are hereby authorized to regulate the sale of fresh meats in accordance with the existing needs of each municipality, in any of the following forms: (*a*) By means of public auctions; (*b*) By administration; (*c*) By authorizing free slaughter.

"Section 2.—That municipalities desiring to regulate the sale of fresh meats by means of public auctions, shall do so through duly enacted ordinance making the necessary provisions for the holding of such auctions with the object of awarding the exclusive privilege of selling fresh meats within the municipality to such person or persons as may offer to sell said meats to the public at the lowest price. All ordinances enacted for the aforesaid purpose shall stipulate the term for which they shall be effective, and shall make such provision as may be necessary for the advertisement of such auctions as shall be held weekly or fortnightly in the form and manner hereinafter determined. Said ordinances may also provide that only the persons to whom the privilege has been duly awarded may sell fresh meats within the municipality, and may fix penalties for violations of this restriction provided such penalties do not exceed a fine of fifty (50) dollars or imprisonment for thirty days for each violation; *Provided*, Said auctions shall be announced by bills to be posted on the front of the city or town hall.

"The minimum quantity of the different classes of meats required for public consumption on each one of the days comprised in the period, and the maximum prices at which such meats may be sold on each of said days, shall be specified every week or fortnight in the announcements of the auctions.

"Every bid shall specify the quantity and class or quality of each class of meat which the bidder agrees to offer for sale, and the price which he binds himself to charge therefor on each of the days included in his bid: *Provided*, That any bid may include either all the days comprised in the week or fortnight or any number of

said days. The board of award, as constituted by section 96 of the Municipal Law, shall award the privilege for the sale of each class of fresh meat on each day of the period of the auction to the bidder offering to sell the same on such day at the lowest price, bearing in mind the class or quality of the meat offered. ·

"Each bid shall be accompanied by a provisional cash bond, and each successful bidder shall furnish a final cash bond conditioned on the faithful observance of all the conditions of his agreement during each and every one of the days for which the privilege shall have been awarded to him. The amount of said bonds shall he stipulated in the ordinance providing for the award of the privilege.

"The board of award shall have the right to reject all bids for any day or days of the weekly or fortnightly period, in which case, as well as in case no bids are received for any day or days of said period, the municipal council shall have the right to call for new bids for such days or to provide the most advisable arrangement to the satisfaction of the municipality.

"Those persons to whom the privilege of selling meats is awarded shall be allowed the use of slaughter-houses and meat-stands belonging to the municipality, on the days for which said privilege shall have been awarded to them, upon payment of reasonable fees established therefor by the municipal council, and subject to such regulations as said corporations may establish.

"Section 3.—Such municipalities as may desire to establish the sale of fresh meats by administration shall do so by duly enacted ordinance temporarily providing for the slaughter of cattle and the sale of meat by the municipality in the form and manner provided by section 104 of the Municipal Law. Any ordinance for this purpose enacted may provide that no person or persons, other than the representatives of the Municipal Government, when officially representing the municipality, shall sell fresh meats within the municipality during such time as said ordinace may be in force, and may provide penalties not to exceed a fine of fifty (50) dollars or imprisonment for thirty days for each violation of these restrictions.

"Section 4.—Such municipalities as may desire to establish free slaughter shall regulate the same by duly enacted ordinance.

"Section 5.—That Act No. 76 of March 9, 1911, and all other laws or parts of laws in conflict herewith are hereby repealed.

"Section 6.—That this Act shall take effect ninety days after its approval."

One of the main purposes of this Act was to enable the municipalities of Porto Rico to establish monopolies in the sale of beeves either by public auctions or by administration as each municipality might elect. When it came to a monopoly by the municipality the sole prerequisite was the form and manner provided by section 104 of the Municipal Law. Section 104 presupposed the approval of the ordinance by the Executive Council of Porto Rico. Presupposing, then, the approval of the Executive Council, Act No. 52 would permit any municipality to establish a monopoly in the sale of beef and might, if universal, prevent any butcher in any part of Porto Rico or from any part of the United States from plying his trade in Porto Rico.

The appellant concedes that the municipality may regulate and, in the ultimate extreme, fix the maximum price at which a particular article might be sold and that this was the practice which had been put into effect in the other municipalities of the island with the approval of the community as a whole. This would tend to show the inequalities that might arise in Porto Rico, inasmuch as a butcher might be allowed to sell meat in one community and could not ply his trade in another. Various municipalities of the Island, by public auctions or by administration, might make it impossible for a butcher from any other part of the United States to ply his trade in Porto Rico, and, as the appellant very well says, if petitioner may thus prevent the sale of meat by a private person, why not flour or any other commodity of life. Somewhere in our researches, although momentarily we have not the case at hand, where a legislature or municipality had sought to prevent the sale of a particular commodity, the particular judge writing the opinion said that if the sale of the particular commodity might be so prevented, so could the sale of even meat, implying, of course, that the sale of meat,

an article of prime necessity, was open to free competition and that anyone might choose to exercise that trade. The absolute prohibition of the sale of meat by individuals was unthinkable.

Any attempt to study the subject matter of the regulation of trades, professions, or of when a monopoly may or may not be created, will lead back to the famous *Slaughter House Cases*, 16 Wall. 36; and, strikingly enough, the question involved was the slaughter of animals for consumption and the right of Louisiana to confer upon a corporation the sole privilege for twenty-five years of controlling the slaughter of the said animals. By a divided court, with vigorous dissents, the right of Louisiana to establish such a corporation was sustained. The majority opinion by Mr. Justice Miller considered the question of monopolies under the state of the law. In early times monopolies arose by royal privilege, by the action of guilds and in other ways until Lord Coke in a renowned opinion showed that monopolies, with few exceptions, were void at law. 11 Coke, 84b, 77 Reprint, 1260. Mr. Justice Miller pointed out, citing from Macaulay, moreover, that the limitations of monopolies was an assertion of the Commons against the Crown; that when the attention of Elizabeth was directed to this practice she promised to stop it. Whether she did so is another question. In any event, no one ever questioned that the Parliament could establish a monopoly. The court in the *Slaughter House Cases* decided that the particular exercise of the police power by Louisiana involved no real federal question; that the regulation of the slaughter of cattle was and had always been within the police power; that no one could doubt that the State could regulate the slaughter and establish public slaughter houses and that if it desired to regulate, it might also incorporate an association for this purpose. Thus the Thirteenth and Fourteenth Amend-

ments to the United States Constitution were not to be invoked.

To the suggestion that the incorporation would prevent a butcher from plying his trade, Mr. Justice Miller said: "But it is not true that it (the Act) deprives the butchers of their right to exercise their trade," and again, "It (the Act) does not, as has been asserted, prevent the butcher from doing his own slaughtering."

It is implicit in the majority opinion that Louisiana had done nothing substantial to prevent a butcher from exercising his trade. The dissenting opinions of Mr. Justice Field and Mr. Justice Bradley made the position of the court clearer. They asserted that Louisiana had violated the Thirteenth and Fourteenth Amendments. These dissenting opinions have been widely quoted as being a correct exposition in general of the right of a man to exercise a trade or profession, subject only to reasonable regulation or as the exigencies of the case might require.

In *Re Aubrey,* 104 A. S. R. (Wash.), 952, a statute requiring horseshoers to pass an examination and providing a penalty for following a trade without a license, was declared unconstitutional. The purpose of the statute was not to raise revenue. The court pointed out that a statute might regulate dentistry and medicine as matters of health in pursuance of the police power, and quoted the leading case of *Re Jacobs,* 90 N. Y. 108; 50 A. R. 636, "Under a mere. guise of police regulations, personal rights cannot be invaded * * *," and the Washington Court cited with approval from Field, J., in the *Slaughter House Cases,* 16 Wall. 87. Similarly, in *Bessete* v. *People* (Ill.) 56 L. R. A. 558. In 29 Corpus Juris, 242, it is said substantially that a health or quarantine regulation cannot be exercised so as to deprive citizens of the exercise or enjoyment of their lawful rights in a manner not injurious or dangerous to others.

Incidentally, we may say that police power and its extent

was considered in the *Slaughter House Cases.* It is incapable of exact definition, as long ago pointed out by Chief Justice Shaw. The Legislature may, *prima facie,* determine the necessity for the regulation of a trade or a business, but it is always open to the courts whether the matter is subject to regulation by the police power. *Allgeyer* v. *Louisiana,* 165 U. S. 578, is probably the clearest case of the Supreme Court of the United States in which the right of the citizen to follow any ordinary occupation is conserved. The court said:

"It was said by Mr. Justice Bradley, in Butchers' Union Company v. Crescent City Company, 111 U. S. 746, 762, in the course of his concurring opinion in that case, that 'The right to follow any of the common occupations of life is an inalienable right. It was formulated as such under the phrase "pursuit of happiness" in the Declaration of Independence, which commenced with the fundamental proposition that "all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness." This right is a large ingredient in the civil liberty of the citizen.' Again, on page 764, the learned justice said: 'I hold that the liberty of pursuit—the right to follow any of the ordinary callings of life— is one of the privileges ·of a citizen of the United States.' And again, on page 765: 'But if it does not abridge the privileges and immunities of a citizen of the United States· to prohibit him from pursuing his chosen calling, and giving to others the exclusive right of pursuing it, it certainly does deprive him (to a certain extent) of his liberty; for it takes from him the freedom of adopting and following the pursuit which he prefers; which, as already intimated, is a material part of the liberty of the citizen.' It is true that these remarks were made in regard to questions of monopoly, but they well describe the rights which are covered by the word 'liberty' as contained in the Fourteenth Amendment.

"Again, in Powell v. Pennsylvania, 127 U. S. 678, 684, Mr. Justice Harlan, in stating the opinion of the court said: 'The main proposition advanced by the defendant is that his enjoyment upon terms of equality with all others in similar circumstances of the privilege of pursuing an ordinary calling or trade, and of acquiring, holding

and selling property, is an essential part of his rights of liberty and property, as guaranteed by the Fourteenth Amendment. The court assents to this general proposition as embodying a sound principle of constitutional law.' It was there held, however, that the legislation under consideration in that case did not violate any of the constitutional rights of the plaintiff in error.''

*Smith* v. *Texas,* 233 U. S. 630, was a case of undue requirements for a train conductor. The court said:

"Life, liberty, property and the equal protection of the law, grouped together in the Constitution, are so related that the deprivation of any one of those separate and independent rights may lessen or extinguish the value of the other three. In so far as a man is deprived of the right to labor his liberty is restricted, his capacity to earn wages and acquire property is lessened, and he is denied the protection which the law affords those who are permitted to work. Liberty means more than freedom from servitude, and the constitutional guarantee is an assurance that the citizen shall be protected in the right to use his powers of mind and body in any lawful calling.

"If the service is public, the State may prescribe qualifications and require an examination to test the fitness of any person to engage in or remain in the public calling. *Ex parte Lockwood,* 154 U. S. 116; *Hawker* v. *New York,* 170 U. S. 189; *Watson* v. *Maryland,* 218 U. S. 173. The private employer may likewise fix standards and tests, but, if his business is one in which the public health or safety is concerned, the State may legislate so as to exclude from work in such private calling those whose incompetence might cause injury to the public. But as the public interest is the basis of such legislation, the tests and prohibition should be enacted with reference to that object and so as not unduly to 'interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations. Lawton v. Steel, 152 U. S. 133, 137.''

*Abbey Land and Improvement Company et al.* v. *County of San Mateo et al.,* 167 Cal. 344, 52 L. R. A. (N. S.) 418, is another illustration of how far the authorities may or may not go in the regulation of business. Anything like a nuisance, as a slaughter house frequently is, may be limited to a certain section of the community or made to go outside

of city limits, etc. The case in question concerned a crematory. The County of San Mateo attempted to grant an exclusive right to a single crematory. Complainants had started another crematory in that part of San Mateo County wherein nothing but cemeteries were located. The court held that the neighborhood in which plaintiff proposed to erect and maintain a crematory was not of a character that required its suppression or prohibition, even if it were inherently as injurious to public health or convenience as a cemetery. It was clear that the operation of another crematory in that vicinity would in no wise be injurious to the public health, comfort or convenience and that it would not injure adjacent property. Said the court: "The advance of such property in price on the market may be retarded owing to the aversion many people have to a residence near a graveyard, but this, as we have seen, is not a ground for the exercise of the police power (citing cases)." It was conceded that the crematory may be operated in a manner that may cause injury to the public health, but that when such danger was averted by its location no further reason existed for preventing the establishment of a crematory. To quote again: "The ordinance in question cannot be upheld as a police measure and as it prohibits the plaintiffs from using their property in a lawful business and in an innocent manner it must be declared void. . . . . . ."

Under a statute allowing the regulation of undertakers a municipality refused a license to an undertaker because he was not an embalmer. The reviewing court said that the Constitution of Massachusetts, like the Constitution of the United States, fixed rights to enjoy life, liberty and property. "This includes the right to pursue any proper vocation to obtain a livelihood," citing numerous cases. The court held that under an exercise of the police power businesses requiring regulation in the interest of health, safety or morals and "perhaps in the strict sense, of the

public welfare'' might be regulated; that the business of undertaking in the interest of health might be regulated, but not in such a manner as to create a monopoly in em-balmers; that embalming was not indispensable. for sepul-ture. The court also incidentally said that the mere charac-terization that the regulation was a health measure was not enough. *Wyeth* v. *Thomas,* 23 L. R. A. (N. S.) 144.

*State ex rel. Sampson* v. *Sheridan,* 1 A. L. R. 955, con-tains a good statement of the principle, citing from Field in *Butchers' Union, etc.* v. *Crescent City, etc.,* 111 'U. S. 757, who said:

"It has been well said that, 'the property which every man has in his own labor, as it is the original foundation of all other prop-erty, so it is the most sacred and inviolable. The patrimony of the poor man lies in the strength and dexterity of his own hands, and to hinder his employing this strength and dexterity in what manner he thinks proper, without injury to his neighbor, is a plain violation of this most sacred property. It is a manifest encroachment upon the just liberty both of the workman and of those who might be disposed to employ him. As it hinders the one from working at what he thinks proper, so it hinders the others from employing whom they think proper. Adam Smith, Wealth of Nations, bk. 1, chap. 10.''

In *Marymont* v. *Nevada State Banking Bd.,* 32 L. R. A. (N. S.) 477, it was held that the State could not limit a banking business to a corporation; that all occupations were subject to reasonable regulations, but that there was no good to the public in this kind of regulations, citing Justice Bradley in the *Slaughter House Cases.*

A State may cause slaughter-house regulations to apply to meat slaughtered for export. *Board of Health of New Jersey* v. *Schwarz,* 87 Atl. 147. An ordinance may go to the extent of prohibiting the sale of meat unless inspected. *Field* v. *Board, etc.,* 90 Atl. 672.

A license to own, run or manage a dental office to be granted without examination involving fitness cannot be re

quired under the police power of the State where there is no intention of engaging in the actual practice of dentistry. *State of Washington* v. *Brown,* 68 L. R. A. 889, saying a druggist who compounds must have a license, but not so with the owner of a drug store, citing from Tiedemann on Limitations of Police Power; but it is a judicial question whether a particular occupation or trade cannot under the constitutional limitation be restrained.

That trade is free and that any man has a right to follow an occupation is also set forth in *Standard Oil Company* v. *United States,* 221 U. S. 53; *People* v. *Weiner,* Ann. Cases 1917 C, 1065. In the latter case it is said that under the Federal and State Constitutions the individual may pursue without let or hindrance all such callings or pursuits as are innocent in themselves and not injurious to the public.

6 Ruling Case Law, 217, also considers the jurisprudence showing that the right of regulation is an exception to the general rule that every person has a right to pursue any lawful calling; that this right of regulation is dependent upon a reasonable necessity for its exercise to protect the health, morals or general welfare of the State; and that hence if a lawful business is of a beneficial character and not dangerous to the public either directly or indirectly, it cannot be subjected to any police regulation whatever and (p. 219) that the conduct of a business may be prohibited entirely in a particular case or in a particular manner; its pursuit may be restricted to certain hours of the day, it may be permitted to be conducted only in case protective devices are used, or it may be permitted in certain forms and a sum of money exacted from the individuals carrying it on for the purpose of recompensing those who suffer losses because thereof. And, on page 222, that the legislature cannot forbid any person or class of persons from engaging in a lawful business; nor can it deprive any citizen of his right

to pursue a calling, occupation or business not necessarily injurious to the community, who is willing to comply with all reasonable regulations imposed upon it.

That the regulation and maintenance of tenement, lodging and boarding houses was a proper subject for legislative regulation was declared in *Bonnett* v. *Valier,* 17 L. R. A. (N. S.) 486, but the court held that the degree of regulation permissible varied greatly according to circumstances. To quote:

" 'Small limitations,' it is said 'of previously existing rights incident to property, may be imposed for the sake of preventing a manifest evil,' while 'larger ones could not be, except by the exercise of the right of eminent domain." Rideout v. Knox, 148 Mass. 368–372, 2. L. R. A. 81, 12 Am. St. Rep. 560, 19 N. E. 390, 392; Sawyer v. Davis, 136 Mass. 239–242, 49 Am. Rep. 27. Note the significant words 'small limitations.' What constitutes such limitations must necessarily be determined with ·reference to the exigencies of the particular situation. So actual destruction of private property under the police power in some cases is proper, while very little interference in others might be held improper. State v. Redmon, supra. There is no certain test by which what is reasonable in any given case can be definitely measured. It is a matter resting in human judgment. So, the line between what is reasonable and what it not, marking the boundary of constitutional authority of the legislature, is one often difficult of ascertainment, rendering it very necessary, in all doubtful cases, for the judiciary to defer to the wisdom of the legislature. But, when the boundary has been plainly passed, the duty of the court to repel the encroachment and so uphold the Constitution is absolute. It has no discretion in the matter. Marbury v. Madison, 1 Cranch, 137 2 L. ed. 60."

Again, on page 496:

"It must be appreciated that 'small limitations' as to the enjoyment of property, having regard to the nature of the case, measure the scope of police interference. Beyond that lies the broad field where the individual is sovereign so that it cannot be entered at all for private purposes, and as said in Rideout v. Knox, 148 Mass. 368–372, 2 L. R. A. 81, 12 Am. St. Rep. 560, 19 N. E. 390, 392, not for public purposes except by the power of eminent domain."

And again, quoting from *Ex parte Jentzsch,* 112 Cal. 468, 2 L. R. A. 664:

"The spirit of a system such as ours is, therefore, at total variance with that which, more or less veiled, still shows in the paternalism of other nations. It may be injurious to health to eat bread before it is twenty-four hours old, yet it would strike us with surprise to see the legislature making a crime of the sale of fresh bread. We look with disfavor upon such legislation as we do upon the enactment of sumptuary laws. We do not even punish a man for his vices, unless they be practiced openly, so as to lead to the spread of corruption, or to breaches of the peace, or to public scandal. In brief, we give to the individual the utmost possible amount of personal liberty, and, with that guaranteed him, he is treated as a person of responsible judgment, not as a child in his nonage, and is left free to work out his destiny as impulse, education, training, heredity, and environment direct him."

A quotation from *State Ex Rel. Sampson* v. *Sheridan,* 1 A. L. R. 958, is also apt:

"The right to follow any of the common occupations of life or to earn one's living in any innocent vocation without let or hindrance, is one of those inalienable rights covered by the statement in the Declaration of Independence, and secured to all those living under our form of government by the liberty, property, and happiness clauses of the national and state Constitutions. 6 R. C. L. p. 266 and other cases."

*State Ex Rel. Lachtman* v. *Houghton,* L. R. A. 1917 F, 1050, was a case which covers a number of points treated in this opinion. There a municipality under apparent authority from the legislature forbade the erection of stores in a residential district or something to this effect. Referring to *Lawton* v. *Steel,* 152 U. S. 133, the court said that in the exercise of its police powers a State is not confined to matters relating strictly to the public health, morals and peace, but, as has been said, there may be interference whenever the public interests demand it; and in this particular a large discretion is necessarily vested in

the legislature to determine not only what the interests of the public require, but what may be necessary for the protection of such interests. If, then, any business becomes of such a character as to be sufficiently affected with public interests, there may be a legislative interference and regulation of it in order to secure the general comfort, health and prosperity of the State, provided the measures adopted do not conflict with constitutional provisions and have some relation to, and some tendency to accomplish, the desired end. The court held that prohibiting the owner from erecting a store building upon land within the residential district could not be sustained as a legitimate exercise of the police power, and also that an ordinance adopted under legislative authority is presumed to be valid, but, nevertheless, must be declared invalid if it clearly impairs rights guaranteed by the Constitution (a very interesting case.)

Where a business is illicit, like a liquor business, the State may establish a complete control of it. *Scott* v. *Donald,* 165 U. S., 108, showing the South Carolina Dispensary System.

In Porto Rico it is the Jones Act, Section 2, Paragraph 1, which provides that no law shall be enacted which shall deprive any person of life, liberty or property without due process of law, and the right to pursue a trade has been decided to be a species of property. It is the Fifth Amendment to the Constitution of the United States which prevents Congress from interfering with honest labor. *Adair* v. *United States* 208 U. S. 161; *Coppage* v. *Kansas,* 236 U. S. 1; *Adams* v. *Tanner,* 244 U. S. 590.

In *Coppage* v. *Kansas* it is said that a State could not by designating as 'coercion' conduct which is not such in truth, render criminal any normal and essentially innocent exercise of personal liberty or of property rights. Similarly, *Bunting* v. *Oregon,* 243 U. S. 426.

In *People* v. *Weiner, supra,* it was held that the sale of

second-hand matter for bedding might be regulated but not prohibited, and it was held that while the courts would not pass upon the wisdom of any act concerning the exercise of the police power, they would pass upon the question of whether such act has a substantial relation to the police power, citing numerous cases (p. 1067). A court must be able to see in order to hold that a statute or ordinance comes within the police power, that it tends· in some degree towards the prevention of offences or the preservation of the public health, morals, safety or health. It must be apparent that some such end is the one actually intended and that there is some connection between the provisions of the law and such purpose.

Tested by these principles, we feel bound to declare Act No. 52 of the year 1917 unconstitutional. The evident purpose of the Act was to permit the establishment of a monopoly in the municipalities of Porto Rico whenever they so elected, at least, for short periods. There is no suggestion in the Act or in our experience that makes it neces· sary for a municipality entirely to prevent a butcher from exercising his trade. As it has been frequently said, the test of the law is not what has actually been done but what may be done by virtue of the authority thereof, but in this particular case the municipality of Caguas has gone to the very limit and made penal the exercise of a butcher's trade by a private person and it was the Legislature of Porto Rico that directly authorized the municipality to punish in case any person should attempt to sell meats.

If also Act No. 52 is examined in the light of the foregoing jurisprudence, one can see that its fundamental conception is wrong. The Act proceeds more or less on the theory that the plying of trade, instead of being a natural right indigenous in the people at large, is a concession from the State or from the Municipality. The authorities show that while the police power may be invoked to

correct abuses hurtful to the community, its exercise is the exception. The broad domain of commerce is free to everyone until a real necessity for regulation arises.

On the face of the complaint the startling fact is revealed that a man is made subject to pains and penalties for merely selling meat, without any showing or suggestion that the meat has not been duly slaughtered or that the meat is in any way unwholesome or unfit for sale, or that the defendant had not complied or was not willing to comply with any reasonable regulation passed by Caguas to regulate the business, or without any suggestion that the business as conducted had become or partook of the nature of a nuisance.

The appellant, however, raised other points which are entitled to some consideration. He maintains that Act No. 52 has been repealed by the legislation of 1919. The old Municipal Law, including section 104 thereof mentioned in Act No. 52, was repealed. A responsible system of municipal government was established which was made in the main independent of control by the Executive Council of Porto Rico. General powers were conferred upon the municipality and it is under these general powers that the municipality should act. Among these powers in the Act of 1919 there is no direct authority delegated to the municipalities to establish monopolies in the sale of beef. The law is clear that in the absence of such direct authority a municipality may never establish a monopoly. (Foregoing authorities, 19 R. C. L., 15 *et seq.;* Dillon on Municipal Corporations, *passim,* and others.)

The judgment must be reversed and the prisoner discharged.

*Reversed.*

Chief Justice del Toro and Justices Aldrey, Hutchison and Franco Soto concurred.